INTERSTATE FIRE INS. CO. *v.* FORD.

5-2490                                             350 S. W. 2d 687

. Opinion delivered November 6, 1961.

[Rehearing denied December 4, 1961.]

*DuVal L. Purkins,* for appellant.

*Paul K. Roberts,* for appellee.

CARLETON HARRIS, Chief Justice.   On August 25, 1958, Interstate Fire Insurance Company, appellant herein, executed to Henry Ford, Sr., appellee, its policy insuring the contents of Ford's premises to the extent of actual cash value of the property at the time of any loss, or the amount which it would cost to repair or replace the property with material of like kind and quality, now, however, to exceed $1500. The schedule recited that the property insured was located in "West End — next to Blackman's Cafe, Warren, Arkansas." "Contents Insurance" was defined as "household and personal property usual to a dwelling (except motor vehicles,

boats and aircraft), including household and personal property purchased under an installment plan and usual to a dwelling, belonging to the Insured or a member of the family of the Insured, while contained in the dwelling.'' On November 21, 1959, Ford's dwelling house and all contents were totally destroyed by a fire. At the same time, equipment in a pressing shop, also owned by Ford, was likewise destroyed. Appellee contends that his living quarters, cafe,[1] and pressing shop were all located in the same building, and that his policy covered the contents of each, while appellant asserts the pressing shop and restaurant were located in a separate building, and the company is not liable for any loss occurring there. Three days after the fire, appellant's adjustor met with Ford, and after some conversation, the latter was given a draft for $499.42.[2] This draft was held for approximately eleven months, at which time it was returned to the company by appellee, with the statement that $1500 was due to be paid for the loss. A few days later, Ford instituted suit against the company for $1500, together with 12% penalty, and attorney's fees. On trial, the jury, in a 9 - 3 verdict, found for appellee in the full amount sought, and the court entered its judgment accordingly,[3] together with 12% penalty and attorney's fee in the amount of $350. From such judgment, comes this appeal. Several points are urged for reversal, but under the view we take, a discussion of each contention is not necessary.

Appellant contends that appellee, by his action in accepting the draft of $499.42 and executing his release therefor, is precluded from recovering **any additional** sums. The proof shows that V. M. Heller, an adjustor for Interstate, together with Cecil Marks, district manager of the company, went to Warren on November 24, 1959, for the purpose of adjusting the loss. They, to-

---

[1] Ford owned the building, furnishings, and equipment in the cafe, but had, some time prior to the fire, leased same to one Blackman.

[2] The loss was adjusted as $494.50, but Ford was due a refund of premium in the amount of $4.92, which was included in the draft.

[3] The actual judgment entered was $1,005.58, inasmuch as the company had already paid into the registry of the court the sum of $499.42. Interest was allowed on this amount in the sum of $38.68.

gether with Ford, examined the dwelling house, and Ford submitted a list of his loss. All of the parties then visited with Moseley Furniture Company, and the butane gas company, and obtained the cost value of the items that had been listed. No examination of the pressing shop or cafe premises was made, because the company contended that it was not liable for any such loss. The cost value was set at $759.35, and was adjusted to the actual cash value at the time of the loss in the amount of $494.50. This adjustment was 65.1% of the 1957 actual cost value. Ford took the draft and delivered it to a lawyer; approximately eleven months later, it was returned to the company. Appellant company contends that Ford's action in accepting the draft and signing the release constituted accord and satisfaction, but, under the circumstances of this case, we do not agree. Ford stated:

"He took me all around the store, and we discussed where it all burned, and he said, 'I'll settle with you if you want it', and I said, 'Yes, sir', and I thought he was going to pay me and he said, 'I'll give you $499 on it', and I say, 'The policy say $1500.00', and he say, 'I'll give you $499.00', and he say, 'I'll give you new stuff if you want it', and I say, 'I don't want no new stuff', and he say, 'I'll give you $499.00', and someone told me to see a lawyer, and I'd get more'n that, and I went up to see a lawyer and he kept it eleven months and kept it . . .

Q. You had another lawyer before Mr. Roberts?

A. Yes, sir. I went to see if he couldn't get me more'n that. I didn't figure that was enough."

Appellee asserts that he was "overreached"; that he took the draft and signed the release because he doubted that he would get any amount if he refused. It does definitely appear that Ford was dissatisfied from the outset. We think, under the proof, that it was a question of fact for the jury to determine whether Ford entered into the settlement freely and voluntarily, and with full knowledge of all his rights under the policy. Ford was

apparently an ignorant colored man, and was, under the evidence, unable to read, and could only write his name.

The proof is not entirely clear as to whether the dwelling, pressing shop, and cafe were joined, and under the same roof. Ford testified that the cafe, pressing shop and dwelling were "tied together"; that the cafe was in the front, the pressing shop in the rear, and the dwelling to the east, some 15 or 20 feet from the pressing shop, but connected by "a little gate you go into about 10 feet where you go in, and joined by the same ramp * * * it's a little place, just enough room to go through it, and I had it over the top of the other building." Cleo Broomfield testified "it was all one building in together" . . . "Just a little passageway between the two buildings." She testified there was a shed between the living quarters and the pressing shop. Hazel Hampton testified that the buildings were adjoined by a passageway with a roof on the back, but not over the front. Susie May Young testified that the pressing shop and dwelling were joined by a roof. We think the evidence was sufficient to make a jury question except that portion of the building occupied as a cafe definitely was not covered. This is shown by the terms of the policy itself, which describes the insured premises as being located "*next* to Blackmans cafe." This language, of course, precludes recovery of property *in* Blackman's cafe.

As to the last, appellee would, at any rate, be precluded from recovery for most items located in the restaurant, because the restaurant equipment, the value of which was introduced into evidence, was not "household and personal property usual to a dwelling." For example, there is testimony of the loss of eighteen stools. This obviously is restaurant equipment. It is not at all clear from the evidence as to the value given the restaurant equipment. From the testimony:

"Henry, you list in this Complaint that you lost some dishes and restaurant equipment.

A.  Yes, sir.

Q. What was the value of the dishes and restaurant equipment?

A. The restaurant . . . all the stuff in it was about $500.00 value.

Q. All of it?

A. $500 value for the whole thing. I had an ice box and deep freeze.[4]

Q. We're not talking about that. We're talking about the dishes in the restaurant.

A. That's all combined.

Q. Talking about the dishes and things in the restaurant, but no taking in the box . . . how much was that worth?

A. I guess . . . I'll say $250.00 for the restaurant equipment, dishes, plates and glasses and stove and sink to wash the dishes.''

This testimony was objected to, and should have been excluded, for these items are beyond the coverage afforded by the policy. Certain other items were listed (objected to by appellant) which obviously cannot be characterized as ''household and personal property usual to a dwelling''; for instance, a steam presser and boiler used in connection with the pressing shop, which Ford testified cost $350; also, three ''puff irons'' valued at $75. Other irons and items are mentioned, but the evidence is insufficient to determine whether these were items usual to a dwelling. Upon a new trial, the testimony should be more fully developed. Likewise, evidence was admitted of the loss of 15 suits of clothes and 15 overcoats from the pressing shop. While the testimony is not entirely clear, it would appear that these coats and suits belonged to customers, since they were located in the pressing shop, and the number seems unusually large for an individual to own. As heretofore

---

[4] Two ice boxes and two deep freezes are mentioned in appellant's evidence; apparently one ice box and deep freeze were located in the dwelling.

mentioned, the policy, in defining "contents insurance" provided coverage only for personal property owned by the insured or a member of his family or being purchased on the installment plan. This, too, can be more fully developed. Since this cause is being remanded, it might also be well to mention that appellee's proof, relative to value of certain items, is rather indefinite. In several instances, he prefaces his evaluation with the word "about", *i.e.*, "about $4.50 a piece" (referring to the value of chairs) ; "I'd say" (referring to the value of beds and springs) ; "I guess", and other testimony of a similar nature.

The judgment is reversed, and the cause remanded.